## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| MARK AND AMBER FESSLER, | § | Civil Action File No. |
| ANDREW HOCKER, KEVIN RUESS, | § | 4:17-cv-00001 |
| MATTHEW CARRERAS, CHARLES AND | § | |
| MICHELLE HANDLY, AARON AND | § | Hon. Judge Amos Mazzant/ |
| STACEY STONE, and DANIEL AND | § | Hon. Magistrate Judge Priest-Johnson |
| SHARON SOUSA, on Behalf of Themselves and | § | |
| Those Similarly Situated | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | |
| | § | |
| PORCELANA CORONA DE MÉXICO, S.A. | § | |
| DE C.V f/k/a SANITARIOS LAMOSA S.A. | § | |
| DE C.V.a/k/a Vortens | § | Jury Trial Demanded |
| *Defendant*. | § | |

---

## SECOND AMENDED COMPLAINT AND CLASS ACTION

---

Plaintiffs, MARK AND AMBER FESSLER, ANDREW HOCKER, KEVIN REUSS, MATTHEW CARRERAS, CHARLES AND MICHELLE HANDLY, AARON AND STACEY STONE, and DANIEL AND SHARON SOUSA on behalf of Themselves and Those Similarly Situated, hereby file this Second Amended Complaint seeking damages against Defendant PORCELANA CORONA DE MEXICO, S.A. DE C.V. f/k/a SANITARIOS LAMOSA S.A. DE C.V a/k/a VORTENS showing this Court as follows:

## PARTY IDENTIFICATION

*Original Plaintiffs.*[1]

1.      Plaintiffs and proposed Class Representatives Mark and Amber Fessler are citizens of the State of Texas and reside at 1714 Ovid Street, Unit A, Houston, Harris County, Texas 77007.

2.      Plaintiff and proposed Class Representative Andrew Hocker is a citizen of the State of Texas and resides at 7322 Sunset Heights Cir., #F-22, Austin, Travis County, Texas 78735.

3.      Plaintiff and proposed Class Representative Kevin Reuss is a citizen of the State of Texas and resides at 2641 Estefania Lane, Round Rock, Williamson County, Texas 78665.

4.      Plaintiff and proposed Class Representative Matthew Carreras is a citizen of the State of Texas and resides at 16030 Port Barrow Drive, Cypress, Harris County, Texas 77429.

*Joinder of Additional Plaintiffs.*[2]

5.      Plaintiffs and proposed Class Representatives Charles and Michelle Handly are citizens of the State of Texas and reside at 15722 Starcreek Lane, Houston, Harris County, Texas 77044.

6.      Plaintiffs and Class Representatives Aaron and Stacey Stone are citizens of the State of Texas and reside at 28202 Sundown Shores Court, Fulshear, Fort Bend County, Texas 77441.

---

[1]      Suit was originally filed by Steven and Joanna Cone as citizens of the State of Texas, and residing in the home located at 12237 Bethel Drive, Frisco, Collin County, Texas 75033. The parties recently filed a Joint Motion for Partial Dismissal along with the appropriate Stipulation regarding resolution by agreement as to the Cones and Michael and Kimberly Aftosmes. [Docs. 56-57]. On December 29, 2017, the Honorable Amos Mazzant issued a Memorandum Adopting the Recommendation and Report regarding partial dismissal. [Docs.58;63].

[2]      Plaintiffs' Unopposed Motion for Joinder of Additional Plaintiffs was filed on November 30, 2017 [Doc. 55], and these individuals were formally joined as Plaintiffs by Court Order on December 11, 2017. [Doc.57].

7.      Plaintiffs and Class Representatives Daniel Sousa and Sharon Malone-Sousa are citizens of the State of Texas and reside at 95 Playor Manor Circle, Woodlands, Montgomery County, Texas 77382.

*Corporate Defendant.*

8.      Grupo Lamosa, S.A.B. de C.V and Grupo Inmobiliario Viber, S.A. de C.V. sold its sanitaryware division, Sanitarios Lamosa, S.A. de C.V. to Grupo Corona on December 14, 2014. On July 30, 2015, Sanitarios Lamosa, S.A. de C.V. conveyed interests and ownership of the trademark symbol and word mark "Vortens" (registration number 2269546), and underwent a name change assignment from Sanitarios Lamosa, S.A. de C.V. to Porcelana Corona de México, S.A. de C.V.

9.      Defendant Porcelana Corona de México, S.A. de C.V. ("Porcelana"), a foreign for-profit corporation with its principal place of business located at Félix U. Gómez 4047 Nte. Monterrey, N.L., México 64510, has responded to this litigation that the appropriate corporate identification for the alleged Defendant in this cause is Porcelana Corona de Mexico, S.A. de C.V. formerly known as Sanitarios Lamosa S.A. de C.V. also known as Vortens (hereinafter "Porcelana").

10.     Upon information and belief, Porcelana is the corporate entity exercising authority and control over the Vortens' products, including for purposes of addressing tank defect claims.

## JURISDICTION AND VENUE

11.     This is a Class Action lawsuit seeking monetary damages pursuant to Federal Rule of Civil Procedure 23.

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship, and the amount in controversy exceeds,

exclusive of interest and costs, the sum of $75,000.[3] Jurisdiction is further conferred upon this Court pursuant to the Class Action Fairness Act in that damages exceed more than $5,000,000 in the aggregate, and the parties are citizens of different states. 28 U.S.C. § 1332(d)(2).

13.     This Court has personal jurisdiction over Defendant because it purposefully availed itself of the privileges and benefits of conducting business activities in Texas by placing its products, which are the subject of this suit, into the stream of commerce with the knowledge that same would be used in Texas and by being authorized to conduct business in the State of Texas. Furthermore, the Defendant's contacts with the forum are continuous and substantial, and the claims of Plaintiffs arise out of Defendant's contact with the forum.[4]

14.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(2), because an event giving rise to the Complaint occurred in this judicial district, and at the time of filing, which is when venue is set, at least one of the Plaintiffs/Proposed Class Representatives was a resident in this venue.[5]

## FACTS AND STATEMENT OF CLAIMS

### *Understanding the Identification of Named Defendant.*

15.     This lawsuit arises from subject toilet tanks bearing the word mark "Vortens" or otherwise displaying the following:

    

---

[3]     Porcelana admits this Court has jurisdiction over this action. [Doc. 16, ¶16].

[4]     Porcelana admits this Court has personal jurisdiction over it. [Doc. 16, ¶17].

[5]     Porcelana admits that venue is proper in this District. [Doc. 16, ¶18]

*The Vortens Product and the Admitted "Technical Issues"*

16.     This matter involves claims arising from the manufacturing and/or marketing defects of certain designated ceramic toilet tanks distributed, sold, and installed in the residences of the general public throughout the State of Texas and the United States.

17.     The manufacturing defects affecting multiple models of toilet tanks designed, manufactured, marketed and distributed by Porcelana causes such tanks to spontaneously crack, causing extensive damage both to real and personal property.

18.     After a significant number of tanks spontaneously failed, professional engineers investigating the occurrences discovered that tanks manufactured using improper processes were distributed without sufficient quality control measures. These tanks contained internal stresses in the ceramic construction of the tanks that suddenly instigated crack propagation.

19.     Public knowledge of the defective nature of tanks manufactured, marketed, and distributed by Defendant was not widespread as claims of failure were addressed through third-party efforts, subrogation litigation for large-loss matters, and on an individual and segregated basis within the Defendant's customer service system.

20.     In 2016, after the media began publicizing the pervasiveness of the unstable strength of Vortens tanks and the frustrations of consumers/owners in obtaining relief, Porcelana openly conceded to "certain technical issues" that "may have" affected two tank models, which were "mainly concentrated on production batches from 2011." *See* EXHIBIT A – PRESS STATEMENT.

21.     Although Porcelana's admissions were carefully couched, the press statement confirmed what individual consumers/owners were discovering only after they were forced to experience a failure event:

- Tanks bearing the Vortens trademark suffered from defects that affected the integrity of the tanks;

- Porcelana was aware that the "issues" arose in the manufacturing process; and

- Porcelana was aware it distributed flawed tanks into the stream of commerce.

*See* EXHIBIT A.

22.     Porcelana's representative Carlos Andrés Ríos Pinto publicly confirmed: "Vortens has ceased production of tank reference #3464 and has improved the manufacturing process of tank reference #3412 to correct and eliminate the possible technical issues that might affect them."

23.     These "improvements" involved removing aged and defective production molds from the casting process, correcting firing and cooling processes, and implementation of pre-distribution quality control measures.

24.     The spontaneous cracking of tanks, however, is not restricted to a single admitted production year nor is same limited to only two models. To the contrary, the failure has manifested in multiple tank models under the manufacturing, distribution, and marketing control of Defendant in production batches dating as far back as 2004.

***Plaintiffs and Proposed Class Representatives.***

<u>The Fessler Plaintiffs</u>

25.     Mark and Amber Fessler are citizens of the State of Texas and reside at 1714 Ovid Street, Unit A, Houston, Texas (hereinafter "the Fessler Residence"). At the time of the completed purchase and transfer of title of said property, four toilet tanks designed, manufactured, marketed, and distributed for commerce by the Defendant were installed in the residence.  All four of these toilets possess Vortens markings, and further are imprinted as product reference model #3464.

26.     Mr. and Mrs. Fessler own a three-story home in the Sawyer Heights community in Houston, Texas. Two days before Christmas, on December 23, 2016, the third-floor bathroom

toilet, Vortens model #3464 bearing a manufacturing date of July 2007, spontaneously and catastrophically cracked.  Because the Fesslers were asleep at the time of the failure, the crack was not immediately discovered. As a result, water continued to flow unabated into the defective tank, and consequently through the crack. The Fesslers experienced water damage to the upstairs flooring, baseboards, paint, downstairs ceiling, drywall, downstairs hardwood flooring, cabinetry, and carpet.  They also incurred damage to property such as rugs, clothing, shoes, and furniture.

27.     In addition to the physical damage to real and personal property, the Fesslers were damaged in expenditures arising from third-party cleaning and remediation services to remove the excess water and provide mold prevention as well as supply and labor costs to repair the damage to the residence.  The Fesslers further incurred the expenses of personal property cleaning and replacement.  Instead of preparing to leave for their trip to spend Christmas Eve with family out of town, the Fesslers spent such time arranging, and paying for, repair and remediation services.

28.     After reporting the incident to family members, the Fesslers discovered Defendant was already aware that a defect affecting multiple models of toilet tanks (including #3464 tank model) was causing spontaneous cracking resulting in extensive damage both to real and personal property of product consumers/owners. The Fesslers, however, were never warned or otherwise notified of the defect prior to experiencing the catastrophic failure during their Christmas holiday. Indeed, although admitting in limited part to possessing knowledge of "technical difficulties" for two models after forced to respond to public criticism, Defendant avoided fully warning at-risk consumers/owners such as the Fesslers, despite having the opportunity and resources to do so.

29.     Based on their personal knowledge and experience that the Press Statement misrepresented the scope of the defect and the years of manufacture, and further that such defect resulted in unpredictable and catastrophic failure and damage, the Fesslers incurred the expenses

of mitigating the risk of further damage by remediating the imminent danger through removal of the remaining three toilets.

30.     The manufacturing defect, quality control errors, and subsequent failure to warn resulted in an ongoing profit-driven distribution to the detriment of the ultimate consumer/owner and same was ongoing despite internal knowledge of a problem.  Correspondence dated February 2, 2017 was forwarded to Defendant regarding the asserted defect and damages, including a request for relief.  Specifically, the Fesslers requested the Defendant compensate them for the damage to real and personal property, remediation costs, mitigation expenditure, and ancillary costs.  In such correspondence, the Fesslers further expressed their interest and intent to represent putative class members similarly situated in regard to their experience with tank failure as well as those facing the necessary cost of mitigating against property damage.

31.     The Fesslers seek recovery for all damages to real and personal property directly and indirectly arising from the failure of the third-floor Vortens tank. Additionally, they seek recovery in an amount that includes their costs of inspection by a licensed professional plumber after the event as to the remaining three Vortens toilets, third-party charges for delivery, removal and disposal of the defective units, additional installation labor expenses remediation costs, mitigation expenses, ancillary supplies, taxes, and fees.

<u>Plaintiff Hocker</u>

32.     Andrew Hocker is a citizen of the State of Texas and resides at 7322 Sunset Heights Cir., #F-22, Austin, Texas (hereinafter "the Hocker Residence"). Mr. Hocker purchased this new construction home on June 12, 2012; at such time, three Vortens model #3436 toilets bearing a manufacturing date of 24 Feb 2011 were installed. On October 19, 2016, Mr. Hocker's then-

fiancée[6] noticed a sound indicating that water was continually running from one of the bathrooms. As she moved to the bathroom to check on the sound, she not only heard the water as it continued to flow to refill the water toilet tank, but further heard a significant pop of porcelain and the sound of a significant flood of water as the tank broke further apart.

33.     Despite Ms. Walker's immediate reaction to turning the water off at the valve after discovering the tank failure, the spontaneous cracking of the tank caused Mr. Hocker damages that extended beyond the defective product itself.  In addition to incurring costs for replacement of the failed tank, he was forced to further incur expenditures for remediation of the excess water and mold prevention as well to address and repair the water-damaged areas of his home.

34.     After the incident, Hocker discovered Defendant was aware that a manufacturing defect affecting multiple models of toilet tanks (including the model and production date of the tanks installed at his residence) was causing spontaneous cracking resulting in extensive damage both to real and personal property of product consumers/owners.  Although he immediately reached out to the Defendant regarding the incident, his urgency was not reciprocated by Porcelana.

35.     Mr. Hocker inspected the tanks of the two remaining Vortens toilets and became concerned regarding the condition of the tank in the master bathroom.  After turning off the water to the tank to prevent any flooding as was experienced previously, he further acted to remediate the risk by removing and replacing the master bathroom tank.  Two days later, as the tank was sitting unused waiting for proper disposal, the tank spontaneously broke open.

36.     Defendant chose to leave consumers/owners such as Mr. Hocker uninformed and unprepared for the catastrophic failure of the tanks and resultant damages.  After discovering that

---

[6]     Andrew Hocker and Bethany Walker married in 2017.

Defendant was aware of this manufacturing defect that resulted in unpredictably damaging additional property, Hocker incurred the expenses of mitigating the risk of further damage by remediating the condition and removing the final affected product tank still left in his home.

37.     After the failure event and subsequent discovery of the acknowledged defect, Hocker attempted to resolve the issues surrounding his incurred damages directly with the Defendant. Several weeks after reaching out to Defendant, Mr. Hocker received a form response regarding Defendant's intention to communicate with him more specifically at a later date.

38.     In the absence of timely follow up by the Defendant in addressing the damages or request for remediation reimbursement, Mr. Hocker sought legal counsel.  Additional demand correspondence dated February 8, 2017 was forwarded to Defendant regarding the defect and damages, including again a request for relief.

39.     Mr. Hocker, therefore, seeks recovery through this suit for all of his out-of-pocket expenditures to replace the failed product as well as for the repair costs to remediate the additional damages to his real and personal property.  He further seeks recovery of remediation expenses that he incurred in order to mitigate additional damages that include, but are not necessarily limited to, the costs associated with the replacement of the two additional toilets manufactured on the same date and installed in his Residence due to the acknowledged risk of sudden, unexpected, and catastrophic cracking event. These costs include expenses associated with product charges and delivery, removal and disposal of the defective units, additional installation labor, ancillary supplies, and taxes.

<u>Plaintiff Reuss</u>

40.     Kevin Reuss is a citizen of Texas and owns the residence at 2641 Estefania Lane, Round Rock, Texas (hereinafter "the Reuss Residence").  At the time of purchase, and at all times

thereafter until the catastrophic failure of the Defendant's product, three toilet tanks manufactured, marketed, and distributed by the Defendant were installed in the Reuss Residence. All of the Reuss tanks bore the trademark "Vortens" and were imprinted as product model #3464.

41.     Mr. Reuss came home from work to discover that the toilet tank in the upstairs bathroom had spontaneously cracked in his absence.  Unabated water flooded the upstairs bath of the Residence for approximately six hours prior to discovery of the failure. As water continued to flow into the tank, and consequently through the crack, the damage spread throughout the upstairs flooring, baseboards, paint, downstairs ceiling, drywall, floor tiling, and carpet.

42.     As a result of the spontaneous failure of the toilet tank, Mr. Reuss experienced real and personal property damages, including but not limited to the cost to remove the defective toilet, cost of the replacement toilet, third-party cleaning and remediation of the excess water and mold prevention, and repair to the ceiling, drywall, tiling, carpet, and paint.

43.     Although not provided warning in time to avoid the damages caused by the spontaneous failure event, Reuss now realized that the defect was not an isolated event. Attempts to obtain relief directly from the Defendant were unavailing, and he received no clarification as to the continuing risk posed by the remaining two tanks.

44.     Defendant did not provide Mr. Reuss warnings regarding the product defect in a timely manner to provide him sufficient time to avoid the damage to his real property, personal property or otherwise avoid the expenses incurred in remediating the damage from the failed tank. Despite his original request and subsequent January 18, 2017 demand, Reuss was not made whole nor received mitigation assistance or reimbursement.[7]

---

[7]     Reuss seeks reimbursement for costs incurred due to errors in Porcelana's replacement of his remaining Vortens toilets, including payment to a local delivery company to ensure timely delivery of replacement tanks.  Additionally, the toilets were placed by Porcelana on his front porch where they remained for a week (throughout the Thanksgiving holidays), subjecting him to fines.

45.     Mr. Reuss, therefore, seeks recovery through this suit for all of his out-of-pocket expenditures to replace the failed product as well as for the repair costs to remediate the additional damages to his real and personal property.  He further seeks recovery of remediation expenses made necessary for the mitigation of additional damages that include, but are not necessarily limited to, additional installation labor, ancillary supplies, and taxes as well as all monetary damages connected with the removal of his not-yet fractured toilets.

Plaintiff Carreras

46.     Matthew Carreras is a citizen of the State of Texas and resides at 16030 Port Barrow Dr., Cypress, Texas (hereinafter "the Carreras Residence"). At the time of purchase of the Carreras Residence, and at all times thereafter, four toilet tanks manufactured, marketed, and distributed for commerce by the Defendant were installed in the Residence. All four of these toilets are marked with the identifying trademarking of the Defendant, and further are imprinted as product reference model #3464.

47.     Specifically, Carreras owns a two-story home in Cypress, Texas. In the Fall of 2016, a toilet tank bearing the imprint of model #3464 spontaneously cracked and leaked water. During the time that the water continued to flow into the tank, and consequently through the crack, significant damage spread from the bathroom throughout multiple rooms, damaging flooring, baseboards, paint, and drywall.  Additionally, the scope of the damage extended to furniture and other personal property exposed to the water released from the tank.    Expenses associated with water damage remediation such as pet boarding, meals, and out-of-residence expenditures were also incurred.

48.     After the incident, Mr. Carreras discovered that a product defect affecting multiple models of toilet tanks designed, manufactured, marketed and distributed by Defendant was known

by such parties to cause tanks to spontaneously crack, causing extensive damage both to real and personal property. Carreras attempted to resolve his request for damages directly with the Defendant on multiple occasions, including a request for the mitigation of further damages through the replacement of the remaining Vortens toilets. He received no response to such efforts.

49.     Mr. Carreras, in addition to seeking the real and personal property damages arising from the failed product, also seeks damages that include reimbursement of his costs associated with the replacement of the two remaining affected models made necessary by the risk of sudden, unexpected, and catastrophic cracking. These replacement costs include expenses associated with product charges and delivery, removal and disposal of the defective units, additional installation labor by a licensed professional plumber, ancillary supplies, taxes, and permit fees.

<u>Handly Plaintiffs</u>

50.     Charles and Michelle Handly are citizens of Texas and reside at 15722 Starcreek Lane, Houston, Texas (hereinafter "the Handly Residence"), a two-story home located in the Summerwood Community. At the time of the completed purchase and transfer of title, five toilet tanks designed, manufactured, marketed, and distributed for commerce by the Defendant were installed in the Handly Residence. All five of these toilets possess Vortens markings, and further are imprinted as product reference model #3464 (four were manufactured in 2011).

51.     On July 16, 2017, Mrs. Handly heard water running in their guest bathroom. Upon inspection, she noticed that the toilet tank was actively leaking water, which was expanding across and into the flooring and baseboards.   Shortly thereafter, the Handlys came across a news article concerning Vortens toilet tank failures that recommended reaching out to Vortens. On August 2, 2017, the Handlys emailed Vortens; while waiting for a response, which was never received, another toilet spontaneously cracked on August 20, 2017.

52.     Specifically, on August 20, 2017, Mr. Handly heard water dripping in an upstairs bathroom.  Upon inspection, he noticed that water was leaking from the toilet tank, and the tank was, in fact, cracked in two places.  Mr. Handly was able to clean up the residual water with limited additional subsequent damage other than personal remediation and mold prevention costs. Subsequently, the Handlys lived nearly three months with the water turned off to all of the remaining Vortens #3464 model toilets out of fear of a catastrophic disaster that might go unabated, only turning the water on when necessary.

53.     The Handly's have since removed all of the Vortens #3464 tanks from their Residence.

54.     The Handlys seek recovery for all damages to real and personal property directly and indirectly arising from the failure of two model #3464 Vortens tanks. Additionally, they seek reimbursement of costs associated with the replacement of the three remaining affected models made necessary by the risk of sudden, unexpected, and catastrophic cracking. These replacement costs include expenses associated with product charges and delivery, removal and disposal of the defective units, additional installation labor by a licensed professional plumber, ancillary supplies, taxes, and permit fees.

<u>Stone Plaintiffs</u>

55.     Aaron and Stacey Stone are citizens of the State of Texas and reside at 28202 Sundown Shores Court, Fulshear, Texas (hereinafter referred to as "the Stone Residence"). At the time of the completed purchase and transfer of title of said property, three toilet tanks designed, manufactured, marketed, and distributed for commerce by Defendant were installed in the residence. All three of these toilets possess Vortens markings, and further are/were imprinted as product reference model #3464.

56.     The Stones own their two-story home in Fulshear, Texas. The Stone Residence was purchased as a new home in 2010.  On July 9, 2017, an upstairs Vortens #3464 model tank manufactured in 2009 spontaneously cracked and caused significant water damage as water continuously poured out of the damaged tank for hours. In addition to the physical damage to real and personal property, the Stones incurred expenditures arising from third-party cleaning and remediation services to remove the excess water and provide mold prevention as well as supply and labor costs to repair damage to the residence.

57.     After the incident, the Stones discovered Defendant was aware that a defect affecting multiple models of toilet tanks (including the model of their own tanks) were spontaneously cracking resulting in extensive damage both to real and personal property of product consumers/owners. The Stones however, were never warned or otherwise notified of the defect or imminent risk of failure prior to experiencing harm.

58.     Although the Defendant significantly limited its public representations of the production years affected by the "technical issues," the Stone tank failure arose from the same common failure mode and defective condition as those tanks that Defendant was admittedly aware.  In conducting her own inspection of the remaining toilets after the initial failure event, Mrs. Stone was able to discern that the Vortens #3464 model located in an upstairs hallway also possessed signs of a crack in the right back portion of the tank.

59.     Unable to merely wait for the cracked tank to reach the impending point of final failure, the Stones incurred the expense of inspection by a licensed plumber, third-party charges for delivery, removal and disposal of all the defective units, and additional installation labor expenses, ancillary supplies, taxes, and fees to complete the mitigation efforts.

60.     The Stones seek recovery for all damages to real and personal property directly and indirectly arising from the catastrophic failure of the second floor Vortens #3464 tank. Additionally, they seek recovery in an amount that includes the cost of their deductible, any other remediation expenses not covered by their insurance company, and reimbursement of costs associated with the replacement of the two remaining affected models. These replacement costs include expenses associated with product charges and delivery, removal and disposal of the defective units, additional installation labor by a licensed professional plumber, ancillary supplies, taxes, and permit fees.

<u>Sousa Plaintiffs</u>

61.     Daniel and Sharon Sousa are citizens of the State of Texas and own 95 S. Playor Circle, Woodlands, Texas (hereinafter referred to as "the Sousa Residence"). At the time of the completed purchase and transfer of title of said property, four toilet tanks manufactured, marketed, and distributed for commerce by the Defendant were installed in the residence. All four of these toilets possess Vortens markings reflecting a manufacturing date of 2010, and further are imprinted as product reference model #3464.

62.     On October 23, 2017, one of their Vortens model #3464 tanks spontaneously cracked and water flowed continuously into their home for several hours causing substantial damage to both real and personal property.  The Sousas subsequently incurred expenditures arising from third-party cleaning and remediation services to remove the excess water and provide mold prevention as well as supply and labor costs to repair damage to the residence and replace personal property.

63.     After the incident, the Sousas discovered Defendant was aware that a defect affecting multiple models of toilet tanks (including the model of their own tanks) was causing

spontaneous cracking resulting in extensive damage both to real and personal property of product consumers/owners. The Sousas however, were never warned or otherwise notified of the defect prior to experiencing the catastrophic failure.

64.     The Sousas incurred both property damage and remediation expenses, including but not limited to the expense of inspection, installation, and removal by a licensed professional plumber, third-party charges for delivery, disposal of all the defective units, ancillary supplies, taxes, and fees.  The Sousas seek recovery for these damages to real and personal property as well as reimbursement for the necessary mitigation expenses incurred by them to prevent additional damages. In light of the recent nature of the failure event, the Sousa Plaintiffs' expenses for damage remediation and mitigation are ongoing.

### *The Defective and Unreasonably Dangerous Condition*

65.     Multiple toilet tank models manufactured, marketed, and distributed by Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens over the course of several years of production are admittedly prone to spontaneous and catastrophic cracking and failure. Despite known and now acknowledged systematic quality control problems at the Defendant's manufacturing and distribution facilities, thousands of defective tanks were exported and distributed throughout the United States.

66.     The unstable condition of the subject toilet tanks, admittedly created by the flawed manufacturing process existed at the time the tanks left the custody and control of Defendant. Although instability and strength defects can be discerned by those with professional manufacturing knowledge through appropriate quality control and product testing, Defendant placed its toilet tank product into the stream of commerce through exports to the United States market that are not in compliance with industry standards.

Defendant's Concessions of "Technical Issues" and Imminent Risk

67.     Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens takes the position in public statements, correspondence, and during litigation that the "technical issues" resulting in a common failure mode is restricted to two models (#3412 and #3464), and only for a limited period of time of production, in 2011.  Defendant's self-tolerant and self-serving limitation of the defective condition of its manufactured tanks apparently stems from its early internal investigation into the unreasonable rate of failure being reported by some of its more significant export distributors.

68.     In 2011, Defendant was forced to address a significant number of complaints and rejected or returned tanks from distributors in the United States. Additionally, numerous claims arising from the unreasonable fragility of its manufactured tanks resulting in fracture and damage to real and personal property were being reported to Defendant.

69.     Distributors initially reported an unacceptable strength in tank model #3464.

70.     Despite internally recognizing and accepting the manufacturing issues being reported by the distributors, #3464 tanks with the same defect continued to be exported by Defendant and installed in structures throughout the United States.

71.     If this wasn't enough, distributors also began reporting unacceptable product strengths in model #3412 tanks.  Although a portion of the #3412 tanks were reclaimed by Defendant prior to installation, a significant number of tanks continued into the United States marketplace and installed in commercial and residential structures.

72.     According to Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens, the "technical issues" resulting in the 2011-12 complaints were caused by improper casting from using defective molds as well as errors that occurred when the ceramic tanks were fired in the kilns and during the subsequent cooling process. Unaccounted for inconsistencies in product loaded for firing affected

the kiln thermal calculations during this time. The ceramic design of the tanks is altered or otherwise negatively affected when the tank is either fired too rapidly, or allowed to cool down too quickly or in an uneven fashion, resulting in residual stresses being formed in the ceramic material.

73.     Although the exacerbation of these known and now acknowledged combined manufacturing issues resulted in a significant distributor backlash in 2011-2012, the defective condition in the tanks is not limited to the models and time period for which Defendant now willingly, yet reluctantly, admits.  The same common defect exists in other models and other years of production.

### Additional Scope of Common Defect, Failure Mode, and Imminent Risk

74.     Defendant's concessions of both manufacturing and quality control failures are limited to a time frame whereby aged and defective molds undeniably exacerbated what were already reduced life problems associated with Defendant's tanks.

75.     Although Defendant limited its self-critical internal analysis to the complaints of its distributors based on the spike in the volume of claims and complaints in 2011-2012, tanks manufactured during an extended production period were compromised by Defendant's improper manufacturing and insufficient quality control processes.

76.     As a result of significant flaws in manufacture processing, tanks were produced that were out-of-specification. Inadequate firing and cooling at the point of manufacture allows the absorption of water into the ceramic through microscopic pores in a non-homogenous manner. Inadequate firing occurs where temperatures do not obtain a high enough temperature to complete the sintering process. This allows residual stresses to be formed in the ceramic materials prior to distribution, and which are not the result of later product handling or use.

77.     Because brittle porcelain material loses strength with increased flaw size, the life expectancy of a porcelain product is dependent on flaw size and the amount of stress applied. The residual stresses created in the improper firing process become concentrated around inclusions in the ceramic material, which in turn causes minute cracks to form that proliferate due to normal and anticipated use of the product. This latent condition causes sudden failure; thus, tank models exposed to improper firing and casting conditions are at imminent risk.

78.     This defective, unfit, and unreasonably dangerous condition exists in the affected toilet tanks at the time they leave the possession or control of the Defendant.

***Knowledge of the Defective Condition of Plaintiffs' Tanks***

79.     Prior to (and ongoing since) manufacturing, marketing, and selling the tanks installed in the Plaintiffs' Residences, Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens possessed actual or constructive knowledge of the above defects described.  Defendant knew or should have known that the toilet tanks in the production lines of certain models manufactured as early as 2004 and up through at least the production year of 2012 were manufactured in a faulty manner and/or were defective, unreasonably dangerous, and were catastrophically failing and cracking, causing damages to the consumers/owners of these products.

80.     Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens admits to possessing actual knowledge of the defective condition of tank models #3412 and #3464 manufactured in 2011 and 2012.  During this two-year time span, Defendant engaged in behind-the-scenes efforts to address some of the prominent failures then-faced by certain large distributors. Defendant did not, however, inform all of its distributors of the exacerbated defective batches nor did it disseminate information to plumbers, builders, or homeowners notifying them of the admitted defect.

20

81.     In addition, Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens was aware, or should have been aware, of spikes in production defects affecting multiple models over the extended pleaded time frame.   These spikes in production defects would have been observable to the Defendant and confirmed upon review of internal reporting data.

82.     Although proper production measures in the manufacturing process would have prevented the defects from arising at all, the implementation of adequate quality control measures prior to final distribution would have prevented the exportation of the defective products into the United States marketplace.

83.     Despite Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens possessing extensive information to <u>discern the affected product defect</u> and fairly warn distributors, retailers, and consumers/owners of the reduced tank strength in distributed models, Defendant, driven by greed, remained silent.  Defendant's wholesale failure to warn Plaintiffs and the putative class of the imminent risk of tank failure, and the need for mitigation of the risk compounded the harm experienced by the Plaintiffs and similarly situated owners and continues to harm those still not yet aware.

84.     Defendant continues its efforts to obfuscate the magnitude of the problem. The defective and unreasonably dangerous condition in production lines of tanks manufactured 2004-2012, including those installed in the Plaintiffs' Residences, was not obvious, open, visible, or discoverable by a reasonable inspection by the Plaintiffs.   Defendant, however, possessed the superior access and knowledge to prevent, discover, remedy and warn consumers/owners of the product defects prior to catastrophic failure, and simply opted to do nothing.

## FRAUDULENT CONCEALMENT - DISCOVERY RULE - AFFIRMATIVE REPRESENTATIONS

85.     Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens further opted for increased sales to the detriment of its customers by failing to immediately account for or otherwise correct its manufacturing processes, resulting in the release of non-compliant tanks of reduced strength into the distribution stream.   Although Defendant knew, or reasonably should have known, of production issues in its firing and cooling processes, it failed to provide timely warnings adequately alerting purchasers, installers, or consumers/owners that same were manufactured in a defective manner, prone to failure, and had a high risk of catastrophically failing and cracking under normal, expected, and foreseeable uses.

86.     Perhaps more egregiously, although Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens was made aware in early 2011 that the use of aged and defective molds was further exacerbating problems in the firing and cooling process, it made a conscious decision to quietly address the issues on a limited basis on behalf of certain distributors. Indeed, Defendant waited until negative publicity required a public response in 2016, at which time Defendant admitted the presence of "technical issues" affecting certain tanks.

87.     Defendant acknowledges that the reduced life of the affected tanks is inherently undiscoverable by the consumer/owner until the fracture event occurs.   The unsuspecting consumer/owner is simply unable to detect or measure the weaknesses inherent in the tanks or the effect the defect has on the expected life of the tank.

88.     Defendant, however, cannot find safe harbor in the inability of the uninformed consumer/owner to discern the instability of its defective product – the Defendant possesses superior knowledge regarding the stages of manufacturing and the data regarding spikes in its internal production defect counts, and it further possesses the sophisticated knowledge required to

conduct appropriate testing of the finished product to detect reduced strength defects prior to release into the marketplace.

89.     Plaintiffs, therefore, could not have, with the exercise of real caution, prudence, or diligence, discovered the latent defect within the applicable statute of limitations, thus tolling same.

90.     Additionally, Defendant had a duty to adequately disclose to Plaintiffs their internal knowledge of the potential for imminent failure, including the full identification of affected models and all years of production affected.  Although willing to satisfy/silence the complaints of its direct distributor customers, Defendant waited until it made headlines in multiple states before acknowledging to the public its awareness of a common failure issue.

91.     Rather than providing full and accurate identification of the defect and affected models, Defendant continues to this day to actively conceal the scope of the imminent harm through material omissions and wordsmithing in order to conceal the extent and scope of the problem. Even though Defendant is aware that its carefully couched percentages of "claims" of defects compared to unit production is inaccurate, Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens continues these misrepresentations in their ongoing efforts to conceal the scope of its wrongdoing.

92.     Defendant knew or had reason to know that the tanks installed in Plaintiffs' Residences were defective and likely dangerous for the use for which they were supplied, and Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens had no reason to believe that those for whose use the toilet tanks were supplied would realize the dangerous condition.  Defendant simply waited for catastrophic failure claims to arise before dealing with same on a limited basis rather than openly informing consumers/owners of the risk associated with the reduced tank strength, or providing a remedy prior to any loss.

93.     Therefore, Defendant's concealment of the unsafe and unfit condition of the affected tanks also tolls the running of any applicable statute of limitations.

## MISCELLANEOUS

94.     Plaintiffs aver that any conditions preceding the institution of this lawsuit have been performed, are contemporaneously occurring, and/or have been otherwise waived.

95.     By filing the lawsuit, Plaintiffs neither intend to, nor in fact do, waive or release any right, claim, action, cause of action, defense and/or election of remedy.

## CLASS ALLEGATIONS

96.     Plaintiffs bring this cause of action individually and on behalf all other similarly situated individuals and/or persons, pursuant to Federal Rule of Civil Procedure 23.

97.     Plaintiffs anticipate  defining this Class as:

*All owners of Vortens toilet tank models #3464, #3412, #3404, #3425, and #3436 manufactured by the named Defendant during the years 2004-2012.*

The above definition will be clarified at the time of the Motion for Class Certification.  It is further anticipated that sub-class definitions and classifications may ultimately be necessary based upon date of manufacture or affected models.

98.     By way of example only, it is anticipated a subclass could be reasonably comprised of owners of tank models #3464 or #3412 manufactured 2011-2012.[8]  The full description and propriety of such a subclass would be fully phrased and defined at the time of the Motion for Class Certification.  By further way of example only, it is anticipated that a second subclass could be reasonably comprised of owners of tank models identified in the Class Definition, but excluded

---

[8]     The trial plan could further segregate this first subclass by damages - remediation and/or mitigation.

from the first subclass, identified by objective product criteria.[9] Again, the full description and

propriety of such a subclass would be fully phrased and defined at the time of the Motion for Class

Certification.

99.     The following persons and/or entities will likely be excluded from the Class:

-   Persons and/or entities who timely opt-out of this proceeding using the correct
    protocol for opting-out that will be formally established by this Court;

-   Persons and/or entities who have settled or otherwise resolved claims against
    the Defendant arising out of or in connection with individual water or flooding
    damages alleged to be caused by a fractured tank of one of the relevant models,
    to the extent of the resolution of those claims;

-   Any and all federal, state, and/or local governments, including, but not limited
    to, their departments, agencies, divisions, bureaus, boards, sections, groups,
    counsels and/or subdivisions; and

-   Any currently sitting Texas state court judge and/or justice in the current style
    and/or any persons within the third degree of consanguinity to such judge
    and/or justice.

100.    As noted above, Plaintiffs intend to seek nationwide certification.[10] However, in

the event that the Court should determine not to certify a nationwide Class, in the alternative,

Plaintiffs seek certification of a Texas-only class.

101.    *Numerosity – Rule 23(a)(1).* Plaintiffs do not know the exact size or identities of the

members of the proposed Class since such information is in the exclusive control of the Defendant.

102.    Upon information and belief regarding the manufacture, distribution, marketing,

and installation of affected tanks, the class likely encompasses thousands of tank owners, if not

---

[9]     The trial plan could further segregate subclasses by damages - remediation and/or
mitigation.

[10]    Plaintiffs anticipate preparation of a trial plan that considers the causes of action pleaded
in the context of state laws through a national comparative compendium prior to the rigorous
analysis required for class certification.

hundreds of thousands.  The improper firing processes and lack of appropriate quality control in the production extends as far back as production references in 2004 with ongoing and continuing production using the same defective processes and insufficient quality control through 2012.

103.   The Class can be ascertained from Defendant's books and records reflecting model manufacturing, sales, and distribution accounts.  In addition to imprinting model numbers and dates of manufacture on the interior of the tanks, Defendant places bar codes containing objectively identifiable data not only as to the specific stages of manufacture, but also its distribution network.

104.   Furthermore, the Class can be ascertained through export documentation and materials tracking the sale of the product through the wholesale distribution chain to the ultimate purchaser.

105.   The Class is comprised of persons extending across the United States, although Porcelana f/k/a Sanitarios Lamosa a/k/a Vortens asserts the 2011-12 large loss occurrence as to models #3464 and #3412 is concentrated in the State of Texas.  As a result, joinder of persons is impracticable.

106.   The disposition of Plaintiffs' claims will provide a substantial benefit to the persons and the court system by using Rule 23 as the vehicle to adjudicate the rights of thousands of individuals and/or entities in one cause of action. Joining and naming each Class Member as a co-plaintiff is unreasonable and impracticable. Such a requirement would only result in Defendant's retention or use of money that is necessary to compensate this Class.

107.   _Predominance and Commonality – Rule 23(a)(2); (b)(3)_.  As to the Class, there are common questions of law and fact which predominate over any questions affecting individual Class Members which include, but are not limited to:

(a)     Successor and predecessor corporate liability in light of mergers, acquisitions, sales, manufacturing control, and contractual transfer of obligations;

(b)     Identification of defects in the casting process, inclusive of quality control processes for mold useful life;

(c)     Identification of defects in the firing process, inclusive of quality control processes for product grouping, kiln operation, drying, and cooling;

(d)     Identification of defects in product quality control processes prior to distribution;

(e)     Determination of substantial similarity in the manufacturing and distribution control process over the identified models and years of production;

(f)     Determination of the presence of a common failure mode arising from the manufacturing process of the product;

(g)     Determination of the reasonable failure rate attributable to models and years of production and distribution;

(h)     Determination of the manner and date of discovery by the Defendant as to actual or constructive knowledge of defects;

(i)     Determination of the scope of foreseeable and anticipated use of the distributed toilet tanks;

(j)     Determination of the expected useful life of the distributed tanks;

(k)     Determination of the scope and adequacy of warnings or notice provided by the Defendant;

(l)     Application of the doctrine permitting recovery for the mitigation of imminent harm;

(m)     Appropriateness of an injunction requiring Defendant to cease and desist from selling, marketing, distributing, and/or placing into the stream of commerce any remaining inventory of the designated tanks;

(n)     Appropriateness of declaratory relief regarding Defendant's practices and procedures for a publically-announced "replacement" program to be made available to all distributors or professionals with remaining inventory of the designated tanks; and

(o)   Appropriateness of declaratory relief regarding Defendant's practices and procedures for a publically-announced "replacement" program to be made available to all tank owners of the designated tanks.

108.   The above listing, albeit preliminary and not exclusive, demonstrates the existence of common questions of law and fact based in the same core evidence for all members of the Class.

109.   Considering the costs associated with the prosecution of a complex product liability case arising from sanitaryware defects, in the event the requested class is not certified as a Rule 23(b)(3) damages class, a Rule 23(c) issues class will promote judicial efficiencies and consistency of judicial result.

110.   _Typicality – Rule 23(a)(3)_. The claims asserted by Plaintiffs are typical of the claims of the Class. The Plaintiffs and the proposed Class Members are tank owners possessing one or more of the affected models.

111.   To the extent necessary, sub-classes can be defined within the proposed class definition based on model and date of manufacture or otherwise separated by damage type classifications.

112.   _Adequacy of Representation – Rule 23(a)(4)._ Named Plaintiffs will fairly and adequately represent the claims of the Class members.  Each of the Plaintiffs have an interest in seeing their claims through to resolution, which will at the same time resolve the claims of the class-members. Furthermore, each of these Plaintiffs expressed a specific desire to participate in the litigation process as active parties for the purposes of securing resolution to the class as a whole.  The Named Plaintiffs are comprised of owners of affected tanks, and have suffered the categories of injury alleged in this cause.

113.   Plaintiffs are represented by competent counsel who have extensive experience in class action and consumer/owner advocacy generally, as well as possessing extensive and specific

experience with claims regarding products liability. Furthermore, counsel has already litigated individual claims arising from the same defective condition at issue in this cause regarding the defective toilet tanks manufactured, distributed, sold, and installed by Defendant. Such counsel can bear the cost of prosecuting the class action to conclusion.

114.    None of the Plaintiffs nor their Counsel are antagonistic with the Class or have an interest in conflict with the Class.

115.    *Superiority – Rule 23(b)(3).* This Class Action is not only the appropriate method for the fair and efficient adjudication of the controversy, but is, in fact, the superior method to all other available causes of action for the following reasons:

a)    The joinder of thousands of geographically diverse individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b)    There is no special interest by Class Members and individually controlling prosecution of separate causes of action;

c)    Class Members' individual claims are relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, expensive, if not totally impossible, to justify individual Class Members addressing their loss;

d)    When Defendant's liability has been adjudicated, claims of all Class Members can be determined by the Court and administered efficiently in a manner which is far less erroneous, burdensome, and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

e)    The Action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims to promote economies of time, resources, and limited pool of recovery;

f)    The Action will assure uniformity of decisions in litigation;

g)    Without the Class Action, Class Members will go without restitution, remediation or money damages;

h)     Without this Class Action, the restitution and/or remediation damages will be borne by the Class members and Defendant will reap the benefits of profits from defectively manufactured, marketed, and/or distributed products;

i)     The resolution of this controversy through this Class Action presents fewer management difficulties than individual claims filed in which the parties may be subject to varying adjudications of their rights; and

j)     Injunctive relief will be available to protect all future consumers/owners from the sale, marketing, and/or distribution defective or unreasonably dangerous products.

116.   Defendant acted in a way that is consistent as to all Plaintiffs and Class Members as to the designated Toilet Tanks, and relief would apply to the Class as a whole, further avoiding individualized adjudications that risk creating inconsistent standards of conduct.

117.   Furthermore, considering the costs associated with individual product litigation requiring expensive expert analysis against a foreign-based corporate entity, the relatively modest amount of recovery compared to the necessary resources to be expended highlights the superiority of the class action mechanism.

118.   The specific elements required of Federal Rule of Civil Procedure 23 will be later argued and proven to the extent same is required of class certification through the filing of an appropriate class certification motion.

## COUNT I – STRICT PRODUCTS LIABILITY
### (By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)

119.   This cause is asserted on behalf of all of the Plaintiffs and proposed putative national class.  Plaintiffs incorporate by reference all prior allegations set forth in in this Second Amended Complaint as if fully set forth at length herein.

120.   Porcelana f/k/a Sanitarios a/k/a Vortens is in the business of manufacturing, distributing, and selling, among other things, porcelain "ceramic" toilet tanks for use in both

commercial and residential structures, including toilet tanks of the same make and model as those installed in the Plaintiffs' Residences.

121.    All of the tanks at issue in this Second Amended Complaint were manufactured, distributed, and/or sold bearing the trademark logo and/or wordmark attributed to "Vortens". Upon information and belief, all rights and interests associated with such marks were either contemporaneously or alternately held by Porcelana f/k/a Sanitarios a/k/a Vortens, and all tanks manufactured, distributed, and/or sold bearing such marks were under the control of Porcelana f/k/a Sanitarios a/k/a Vortens at all relevant times based upon ownership, or otherwise upon transfer of liabilities, merger, or acquisition.

122.    The toilet tanks installed in each of the Plaintiffs' Residences suffer from the same manufacturing defect—reduced strength and increases unacceptable porosity levels due to casting, firing, and cooling inconsistencies. Such tanks are not reasonably safe for use as should be expected, and same were defective at the time each product tank left the possession or control of the Defendant.

123.    The tanks at issue in this suit are unfit for their intended purpose due to deviation in construction or quality.  The scope of the defect affects tank references #3464, #3412, #3404, #3425, and #3436 manufactured, produced, marketed, or distributed by the Defendant between 2004-2012.  These tanks were subjected to improper temperature controls and further not properly tested under appropriate and necessary quality control checks. Such improper acts and omissions by the Defendant resulted in the distribution and ultimate installation of defective tanks with a latent condition unknown to consumers/owners, such as the Plaintiffs.

124.    The affected tanks were expected to, and indeed did, reach consumers/owners without substantial change in the condition in which they were sold.

125.    The defects in these tanks cause catastrophic failure and cracking, and were the producing causes and/or proximate causes of the damages of repair, replacement, remediation, and risk mitigation costs suffered by the Plaintiffs as described herein.  Plaintiffs, therefore, assert that damages are appropriately recoverable, and further allege that the act of shifting costs to these plaintiffs is the very type of market failure and economic harm consumer protection laws were designed to prevent.  Plaintiffs and class members are left with few options – not only must they pay for the actualized damages after catastrophic failure, but further must either accept the remaining imminent risk to property, or undertake personal costly measures to mitigate the damages caused by the Defendant's conduct.

126.    The refusal of the Defendant to fully acknowledge, accept or remedy the affected model tanks causes continuing harm to even the most diligent putative class member.  Indeed, Defendant permits the continued distribution of defective product, and in only the most ambiguous of manners acknowledges the reduced life of certain, but not all, model tanks.

127.    Porcelana f/k/a Sanitarios a/k/a Vortens, by the application of reasonably developed skill and foresight, should have known about the inherent risks in the foreseeable use of these tanks. Despite the knowledge that the product possesses a high risk of catastrophically failing and cracking, Defendant failed, and continues to fail, to prevent the harm.

128.    Plaintiffs, and the anticipated Class Members, are faced with the untenable choice of simply waiting for failure to occur and risk extensive damage to real and personal property or otherwise incur personal expenses to repair or remediate the impending danger.  Plaintiffs have suffered actual, physical losses to real and personal property as a result, both from catastrophic failure and the necessity of engaging in mitigation of imminent harm.

129.     As a direct, producing, and proximate result of the defective condition of the designated tanks, the Plaintiffs and Class Members have suffered and continue to suffer damages in amounts equal to inspection, repair to real and personal property, replacement, remediation, and/or ongoing mitigation costs.

## COUNT II—BREACH OF IMPLIED WARRANTY
### (By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)[11]

130.     This cause is asserted on behalf of all of the Plaintiffs and proposed putative national class.  Plaintiffs incorporate by reference all prior allegations set forth in in this Second Amended Complaint, as if fully set forth at length herein.

131.     Porcelana f/k/a Sanitarios a/k/a Vortens is a merchant with respect to goods of the kind as the designated tanks installed in the Plaintiffs' Residences.  Importantly, as a manufacturer, Defendant is obligated to ensure that its goods are merchantable when same leaves its control.

132.     By distributing or otherwise selling toilet tanks to consumers/owners, Defendant impliedly warranted that same were fit for the ordinary purposes for which such goods are used.

133.     The Uniform Commercial Code §2-314[12] recognizes that "a warranty that the goods shall be merchantable is implied in a contract for sale if the seller is a merchant with respect to goods of that kind." Whether express or implied, warrantying the merchantability means Defendant necessarily warranted their goods will possess capabilities of the kind and quality permitted and expected for each and all purchased units.

---

[11]     Alternatively, Plaintiffs assert Count II on behalf of themselves and a Texas-only putative class under the purview of the Texas Uniform Commercial Code warranty provisions. *See* TEX. BUS. & COM. CODE §2.313-2.315.

[12]     The Uniform Commercial Code has been adopted by every state with the exception of Louisiana. To the extent Louisiana differs from the UCC, if in any relevant part to this action, same will be addressed in the context of the anticipated certification motion.

134.     Porcelana f/k/a Sanitarios a/k/a Vortens breached this implied warranty of merchantability by placing into the stream of commerce a defective product that can spontaneously and catastrophically fail despite its use in an expected fashion.

135.     Porcelana f/k/a Sanitarios a/k/a Vortens was unjustly enriched by placing profits over quality and safety. Defendant opted to maintain the profits from the production and sale of defective product while avoiding full exposure of costs for remedy.

136.     Furthermore, where a seller has reason to know any particular purpose for which the goods are required, and that the buyer is relying on the seller's skill or judgment to furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose. *Id.* at §2-315.

137.     As a direct, producing, and proximate result of the defective condition of the tanks, the Plaintiffs and Class Members have suffered damages in amounts equal to inspection, replacement, ancillary repair to real and personal property damaged after catastrophic failure, remedial installation plumbing services, and costs associated with mitigation of imminent additional risk.

## <u>COUNT III- NEGLIGENCE</u>
### (By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)

138.     This cause is asserted on behalf of all Plaintiffs and proposed putative national class.  Plaintiffs incorporate by reference all prior allegations set forth in in this Second Amended Complaint as if fully set forth at length herein.

139.     Porcelana f/k/a Sanitarios a/k/a Vortens owed the Plaintiffs and Class Members a duty of care to manufacture, market, distribute, and sell toilet tanks in a safe and non-defective manner so as to avoid injury or damage to the Plaintiffs, Class Members, and their property.

140.    Porcelana f/k/a Sanitarios a/k/a Vortens breached this duty of care in the manner in which the tanks were manufactured, marketed, distributed, and ultimately sold. Defendant's negligence extends into the manner in which they are informing (or misinforming) the public in regard to the extent of the affected models that stand in immediate risk of catastrophic failure and cracking.

141.    Specifically, Porcelana f/k/a Sanitarios a/k/a Vortens was negligent by committing the following acts of commission and omission, among others:

    a.  Unreasonably allowing the use of deficient casting molds or molds beyond their usable "life," which resulted in defective product prior to firing;

    b.  Unreasonably failing to account for inconsistent loading procedures prior to entry into the kiln, which resulted in improper variations in firing temperatures;

    c.  Failing to properly and timely inspect and test tanks that were part of the production line of toilet tanks manufactured 2004-2012 to ensure that these toilet tanks were manufactured in a safe and non- defective manner, and that the toilet tanks did not deviate in their construction or quality from the specifications or planned output in a manner that rendered them unreasonably dangerous or unfit for the intended purpose;

    d.  Unreasonably failing to provide adequate warnings of reduced strength or imminent risk of tank failure; and

    e.  Committing other negligent acts of commission and omission that may be revealed through further investigation, including discovery.

142.    As a direct and proximate result of the breach of duties through both negligent acts of commission and omission, the Plaintiffs and Class Members have suffered damages in amounts equal to inspection, replacement, ancillary repair to real and personal property damaged after catastrophic failure, remedial installation plumbing services, and costs associated with mitigation of imminent additional risk.

143.     Porcelana f/k/a Sanitarios a/k/a Vortens had specific knowledge of the defective and unreasonably dangerous condition of tanks suffering from conceded "technical issues" affecting tank models #3412 and #3464.  Defendant purportedly conducted an internal investigation into these issues, but failed to inform all of its distributors or the public regarding the excessively fragile condition of the tanks.

144.     Furthermore, Porcelana f/k/a Sanitarios a/k/a Vortens possessed knowledge and data of spikes in production defects and increase in claims 2006-2012. Despite having superior knowledge of errors in manufacturing processes that resulted in reduced strength of the model tanks, Porcelana knowingly made a conscious decision not to issue warnings adequately alerting the public or any persons or entities, including building contractors, plumbing contractors, installers, building inspectors, or ordinary consumers/owners of these defective tanks that these toilet tanks were manufactured in a defective manner, prone to failure, or had an imminent  risk of catastrophically failing and cracking under normal, expected, and foreseeable uses.

145.     Porcelana f/k/a Sanitarios a/k/a Vortens also knowingly and/or intentionally made a conscious decision not to take reasonably feasible measures to promptly and timely correct the defective or faulty manner in which the tanks were manufactured or otherwise improve the quality control processes prior to 2012.  Instead, Defendant delayed correcting the manufacturing issues and quality control prior to distribution until such time as the fragility of the tanks resulted in the large loss occurrence in 2011-12.

146.     Defendant engaged in willful and wanton conduct and/or were grossly negligent in its manufacturing, marketing and distribution of products it knew or reasonably should have known were defective or not otherwise fit for the intended purpose. Such conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the welfare, safety,

and/or rights of persons exposed to such conduct, including the Plaintiffs and putative class members.

147.    Plaintiffs and the putative class members are, therefore, entitled to recover punitive damages from Porcelana f/k/a Sanitarios a/k/a Vortens.

## COUNT IV - ACTION UNDER THE DTPA
### (By all Named Plaintiffs and Texas-only Class)

148.    This cause is asserted on behalf of all of the Plaintiffs and proposed putative Texas-only class. Plaintiffs incorporate by reference the allegations set forth in all prior paragraphs of this Amended Complaint, as if fully set forth at length herein.

149.    The Plaintiffs and proposed Class Members are consumers/owners within the meaning of § 17.45(4) of the Texas Deceptive Trade Practices Act (DTPA) in that they are individuals who acquired by purchase the goods or products that form the basis of this lawsuit, and suffered damages for which they did not receive full remedy or compensation from any third party, person, or entity.

150.    The Plaintiffs seek to recover damages against Porcelana f/k/a Sanitarios a/k/a Vortens under the Texas DTPA, Tex. Bus. & Com. Code Ann. § 17.41 *et. seq*., because the Defendant knowingly and/or intentionally breached warranty obligations with respect to the referenced tanks in this lawsuit as pleaded in Count II of this Second Amended Complaint in violation of the Texas Business and Commerce Code §17.50(a)(2).

151.    Furthermore, Porcelana f/k/a Sanitarios a/k/a Vortens took advantage of its product consumers'/owners' lack of adequate or otherwise complete knowledge, ability, experience, or capacity to a grossly unfair degree to the detriment of Plaintiffs and the putative Texas-only class in violation of the Texas Business and Commerce Code §17.50(a)(3).

152.     The Defendant's conduct in engaging in such acts or practices constituted a producing cause of the damages suffered by the Plaintiffs such that the Plaintiffs have the right and standing to maintain an action against Defendant under the Texas DTPA pursuant to § 17.50.

153.     The Defendant's violations of the DTPA proximately caused the Plaintiffs and the putative Texas-class members to suffer damages in amounts equal to inspection, replacement, ancillary repair to real and personal property damaged after catastrophic failure, remedial plumbing services, and costs associated with mitigation of imminent additional risk.

154.     Pursuant to § 17.50(d) of the Texas DTPA, the Plaintiffs and Class Members are entitled to be awarded court costs and reasonable and necessary attorneys' fees.

155.     Because the Defendant' conduct as described above in this Count IV was committed knowingly and/or intentionally, the Plaintiffs and Class Members are also entitled to be awarded treble damages.

156.     Plaintiffs originally averred that notice under Section 17.505 prior to filing suit was both impractical and unnecessary considering the public admissions of a defect in the affected tanks.  However, Plaintiffs have also separately provided notice and demand to the Defendant.

157.     Because false, misleading, or deceptive acts or practices in the conduct of any trade or commerce is subject to action by the Texas Consumer Protection Division under Sections 17.47, 17.58, 17.60, and 17.61 of the Act, Plaintiffs previously provided the Attorney General's Office - Consumer Protection Division with notice of this litigation.  Plaintiffs are contemporaneously providing a copy of this Second Amended Complaint to the Texas Consumer Protection Division as well.

## **INJUNCTIVE AND/OR DECLARATORY RELIEF**
### **(By all Named Plaintiffs and Texas-only Class)**

158.     Plaintiffs hereby seek an appropriate order enjoining Porcelana f/k/a Sanitarios a/k/a Vortens from further selling, marketing, distributing, and/or otherwise placing the designated tank models still held in inventory into the stream of commerce that were manufactured in the pleaded time period.

159.     There is an actual controversy between Porcelana and class members concerning the defect in the identified production years of designated tank models.

160.     Plaintiffs further request such order require Porcelana f/k/a Sanitarios a/k/a Vortens to appropriately notify its sales representatives, distributors, and retailers of the injunctive order, and instruct same to cease and desist any further sales of the designated tanks still held in inventory by such distributor or retailer.

161.     Plaintiffs further seek an order that Porcelana f/k/a Sanitarios a/k/a Vortens cease and desist from continuing its public self-limiting and inaccurate statements that result in purchasers or consumers/owners delaying mitigation of imminent harm or otherwise failing to act to claim available remedies.

162.     Pursuant to 28 U.S.C. §2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or can be sought." Plaintiffs, therefore, seek a declaration that the affected tank models manufactured during the designated time period are defective and pose a serious risk to consumers/owners and the public.

163.     Plaintiffs further seek a declaration that the identified product has common defects in their manufacture.

Case 4:17-cv-00001-ALM-KPJ   Document 74   Filed 01/19/18   Page 40 of 41 PageID #:  989

164.     In light of the contemporaneous notification of this proposed class action arising from violations of the Deceptive Trade Practices Act to the Consumer Protection Division of Texas Attorney General's Office, Plaintiffs recognize that injunctive relief may be circumscribed by the Attorney General during the course of its investigation into the corporate name changes, alterations in registration for conducting business in the State of Texas, and product defect affecting State citizens.  Plaintiffs will cooperate or otherwise coordinate its private pursuit of injunctive relief for not only Texas class members in conjunction with any State action, but further as to affected national class members to the extent necessary.

### RELIEF REQUESTED

165.     Plaintiffs, Individually and on behalf of all similarly situated persons and/or entities, respectfully request that the Court grant the following relief and/or enter judgment against the Defendant as follows:

a)     Certify this cause of action as a class action pursuant to Rule 23 and appoint Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

b)     Award appropriate monetary damages to Plaintiffs and the proposed Class in an amount equal to the amount to remediate the premises or otherwise mitigate the imminent risk of additional damages in an amount to be determined at trial for the wrongful acts of Defendant described herein;

c)     Award punitive damages upon proof of knowing and intentional gross negligence or malicious behavior;

d)     Award all damages statutorily available to Texas consumers/owners in light of the deceptive trade practices of the Defendant, including but not limited to the trebling of damages and the awarding of attorney fees;

e)     Award such equitable relief permitted, including an injunction requiring Defendant to notify all Class Members that they are entitled to submit an initial, additional or supplemental requests for payment in connection with prior loss and/or damage to their structures and/or premises;

f)     Order Defendant to engage in accurate, corrective educational advertising;

g)      Award restitution as provided by law, inclusive of appropriate pre-judgment interest;

h)      Award reasonable and necessary attorneys' fees and costs to Class counsel; and

i)      Award such other and further relief in law or in or equity as the Court determines fair, reasonable, appropriate, and/or just deems just.

Respectfully submitted,

_____*/s/ N. Scott Carpenter*_____
**N. SCOTT CARPENTER**
State Bar No. 00790428
**REBECCA E. BELL-STANTON**
State Bar No. 24026795
CARPENTER & SCHUMACHER, P.C.
2701 NORTH DALLAS PARKWAY, SUITE 570
Plano, Texas 75093
(972) 403-1133
(972) 403-0311 [Fax]
**scarpenter@cstriallaw.com**
**rstanton@cstriallaw.com**

*ATTORNEYS FOR PLAINTIFFS AND
PROPOSED CLASS*